IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ISAN CONTANT, | : |
| | : |
| Plaintiff | : |
| | : CIVIL NO. 1:CV-08-1403 |
| vs. | : |
| | : (Judge Caldwell) |
| CRAIG LOWE, *et al.*, | : |
| | : |
| Defendants | : |

*M E M O R A N D U M*

I.  *Introduction*

The pro se plaintiff, Isan Contant, was a detainee of the Bureau of Immigration and Customs Enforcement (ICE).  He was held for a time at the Pike County Correctional Facility, Lords Valley, Pennsylvania.[1]  He filed this civil rights action alleging that while he was at that facility he was denied religiously compatible meals during a four-month period in 2008, preventing him from adhering to his Islamic religious beliefs.  He asserts claims under the First Amendment and the Due Process Clause.  He also asserts claims under the Religious Land Use and Institutionalized Persons Act (RLUIPA), 42 U.S.C. § 2000cc, and the Pennsylvania Religious Freedom Protection Act (RFPA), 71 Pa. Stat. Ann. §§ 2401-2407 (West Supp. 2010).

---

[1] Contant is presently housed at the Perry County Prison in New Bloomfield, PA.

The parties have filed cross-motions for summary judgment. We will evaluate the motions under the well established standard. *See Lawrence v. City of Philadelphia*, 527 F.3d 299, 310 (3d Cir. 2008). In doing so, we will grant the defendants' motion for summary judgment and deny Contant's motion.

II. *Background*

We take this background from the properly supported factual assertions in the parties' briefs and the evidentiary submissions.[2]

Isan Contant is a Muslim. Doc. 40, Am. Compl. at p. 8.[3] Islam forbids the consumption of Haraam food and commands its followers to eat only food that is Halal.[4] *Id.* According to Contant, "it is a sin to disobey the rules of Islam." *Id.*

At all times relevant to this proceeding, the Pike County Correctional Facility offered a modified diet that met the religious requirements of Muslim inmates such as Contant. DSF at ¶ 3; PADSF at ¶ 3. Prior to June 2, 2008, a kosher diet was provided to Muslim inmates, like Contant, who requested a modified diet for religious needs. Doc. 62,

---

[2] As there are cross-motions for summary judgment, the following documents and their exhibits are relied upon and cited to as follows: (1) Doc. 54, Defs.' Statement of Undisputed Facts (DSF); (2) Doc. 61, Pl.'s Answer to Defs.' Statement of Undisputed Facts (PADSF); Doc. 59, Pl.'s Statement of Undisputed Facts (PSF); and Doc. 66, Defs.' Answer to Pl.'s Statement of Undisputed Facts (DAPSF).

[3] Unless otherwise noted, all citations to the record are to the docket number and page number assigned by the electronic case filing system (CM/ECF) rather than the page numbers of the original documents.

[4] Haraam is an Arabic term meaning "forbidden." Halal is the Arabic word for "lawful." *See* http://www.worldofislam.info/

Meal Procedures, at p. 6.  Inmates who wanted to be on the religious diet were required to seek approval from the facility Chaplain or the Director of Programs.  *Id.*  The Meal Procedures policy instructed that "[I]nmates that request modified diets will be required to strictly adhere to these meals."  *Id.*  On or about March 12, 2008, Contant was placed on a religious diet after he requested it.  DSF at ¶ 4; PADSF at ¶ 4; Doc 40 at p. 27.

On June 2, 2008, the prison enacted a new Modified Diets procedure.[5]  The newly enacted "common fare" diet was created for the purpose of providing a diverse inmate population with an singular menu plan that would meet the religious needs of all inmates.  Doc. 55, McLaughlin Decl. at ¶ 5.  On June 2, 2008, Contant was placed on the "common fare" diet.  *Id.*

> The common fare diet consists of food items which have been deemed acceptable by all religions.  Inmates on the common fare diet roster cannot eat "regular food" whatsoever. Additionally, inmates on the common fare diet must not consume "regular commissary," but may consume commissary items identified as "universal" on the commissary menu (the Universal items are compatible with the religions requiring a diet accommodation).  Inmates found to be in violation of this protocol, will be removed from the roster for ten (10) days for the first offense.  If this protocol is violated again by the same inmate they will be removed from the common fare diet for ninety (90) days.
>
> . . . .
>
> Failure to adhere to these protocols will denote an insincere adherence to required religious practices.
>
> . . . .

---

[5]  A copy of this new policy is found at Doc. 55-2.

-3-

> Housing Officers will monitor inmate dining hall habits and will
> report any inmate failing to observe their specified diet or eating
> foods that are not an approved part of the diet.

Doc. 55-2 at pp. 2 - 4. The responsibility for approving or denying an inmate's participation in the religiously modified "common fare" diet rests with the Assistant Warden *Id.* at p. 3.

Contant received a religious modified diet from March 12, 2008, until June 10, 2008. Doc. 1 at p. 8; Doc. 41, Answer at p. 4. He was suspended from the "common fare" diet after it was discovered that he was consuming and purchasing regular food items that do not comply with the common fare religious diet. DSF at ¶ 7. Specifically, on June 9, 2008, Contant and several other inmates on the "common fare" diet, were observed by a corrections officer to be "eating soup" from the regular menu. DSF at ¶ 6; Doc. 62 at p. 8, prison incident report. A review of Contant's commissary purchases was then conducted and revealed that between March 12, 2008, and July 27, 2008, he purchased a variety of non-universal foods. DSF at ¶ 6; Doc. 55-3, Contant's Commissary purchases. There are 54 items on the commissary menu which comply with all religious dietary restrictions. Doc. 55, McLaughlin Decl. at ¶ 8.

Contant admits that in March 2008, after he sought a diet that complied with his Islamic faith, he "bought regular commissary" but did not know there was a rule against such purchases. Doc. 40 at p. 20. Some of the "regular" food items that Contant purchased at commissary prior to June 2, 2008, were: combos; cheese curls; SS tea w/ lemon; chili soup; beef soup; fruit punch mix; nutri-grain bars; and peanut butter squeezers. Following his removal from the "common fare" religious diet list in July 2008, Contant

continued to purchase "regular" food items: jolly ranchers; salted peanuts; trail mix; combos; and cherry drink mixes.  Doc. 55-3, pp. 1-4.

Pursuant to the prison Dietary Policy, Contant was suspended from the common faire diet for a period of 90 days.  DSF at ¶ 7.  However, as he continued to purchase regular commissary in violation of the policy, he was not placed back on the religiously compliant diet until early October 2008.[6]  DSF at ¶ 8; Doc. 61 at ¶ 8.

Defendants Wincovich, Derrick, Kumures and Lambigne have no role in formulating the Dietary Policy or suspending Contant from the religiously compliant diet.  DSF at ¶ 9; PADSF at ¶ 9.  These defendants simply served Plaintiff his meals.  *Id.*  These defendants did not have the authority to grant Contant's request for a religiously compliant meal by enrolling him in the "common fare" diet.  Doc. 56, Lowe Decl. at ¶ 5; Doc. 56-2 at p. 3, Modified Diet policy; and PSF at ¶ 6.  It is the responsibility of Warden Lowe and Deputy Warden McLaughlin to enforce the dietary policy.  Doc. 56, Lowe Decl. at ¶ 5; Doc. 56-2 at p. 3, Modified Diet policy; and PSF at ¶ 6.  Contant needed to obtain approval from Deputy Ward McLaughlin in order to be reinstated to the common fare diet.  Doc. 55-2 at p. 3.

Contant alleges that he was never given any notice or hearing for any alleged dietary violations until he was denied religious compliant meals.  PSF at ¶ 12.  He states he

---

[6] Technically, Contant's last non-conforming commissary purchase was July 22, 2008, thus according to the Modified Diet policy, he had to wait a period of 90 days until he could be reinstated, i.e. Monday, October 20, 2008.  Doc. 55-2; Doc. 55-3.  He concedes he started receiving the common fare diet in early October 2008.  Doc. 61 at ¶ 8.

was unaware of the new Modified Diet policy until "after the commencement of the instant § 1983 action."[7]  PSF at ¶ 5.

When Contant filed his Amended Complaint he withdrew his claims against Lt. Kumbures and removed him as a defendant in this action.  Doc. 40 at p. 2.

The parties dispute the following: (1) whether Contant had notice that he was not to consume regular food from the commissary while enrolled on the common fare diet; and (2) whether he ate soup from the regular food line as reported by a corrections officer.

III.   *Discussion*

Contant alleges the defendants denied him a religiously mandated diet in violation of his rights under the Due Process Clause, the First Amendment, RLUIPA and RFPA.

> A.   *Contant's Removal from the "Common Fare" Diet Did Not Violate His Due-Process or First Amendment Rights*

"[C]onvicted prisoners do not forfeit all constitutional protections by reason of their conviction and confinement in prison."  *Bell v. Wolfish*, 441 U.S. 520, 545, 99 S.Ct. 1861, 1877, 60 L.Ed.2d 447 (1979).  "The First Amendment, applicable to the States by reason of the Fourteenth Amendment . . . prohibits government from making a law 'prohibiting the fee exercise (of religion).'"  *Cruz v. Beto*, 405 U.S. 319, 322, 92 S.Ct. 1079,

---

[7] Plaintiff initiated this action on July 21, 2008.  PSF at ¶ 5; Doc. 1, Compl. at p. 12.  Yet, on June 10, 2008, Contant inquired why he was taken off the "common fare" diet.  Doc. 1-2 at p. 1.  Then in early July, he requested to be placed on the "common fare alternative diet list."  *Id.* at p. 3.

1082, 31 L.Ed.2d 263 (1972)(citation omitted).  The United States Supreme Court has recognized that an inmate's right to freely exercise his religion may be subject to reasonable restrictions while incarcerated.  *Banks v. Beard*, 548 U.S. 521, 528, 126 S.Ct. 2572, 2577-78, 165 L.Ed.2d 697 (2006)(citing *Turner v. Safley*, 482 U.S. 78, 93, 107 S.Ct. 2254, 2260-61, 96 L.Ed.2d 64 (1987)).  An inmate retains only those "First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system."  *Pell v. Procunier*, 417 U.S. 817, 822, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495 (1974).  Accordingly, in order to establish that defendants violated his First Amendment rights to the free exercise of religion, Plaintiff must show that they prevented him from exercising that right without any justification that is reasonably related to a legitimate penological interest.  *See Beard*, 548 U.S. at 528, 126 S.Ct. at 2577-78 (citing *Turner*, 482 U.S. at 89, 107 S.Ct. at 2260-61).

   Additionally, "a prisoner challenging a prison regulation on the ground that it interferes with the prisoner's right to exercise religion freely must first establish that his alleged beliefs are both sincerely held and are religious in nature."  *Brown v. Johnson*, 116 F. App'x 342, 344 (2004)(nonprecedential) (citing *DeHart v. Horn*, 227 F.3d 47, 51-52 (3d Cir. 2000)).  "The mere assertion of a religious belief does not automatically trigger First Amendment protections, however.  To the contrary, only those beliefs which are both sincerely held and religious in nature are entitled to constitutional protection."  *DeHart v. Horn*, 227 F.3d 47, 51 (3d Cir. 2000).  Finally, "the burden is not on the state to prove the validity of the challenged regulation, but instead is on the inmate to disprove it."  *Williams v.*

*Morton*, 343 F.3d 212, 217 (3d Cir. 2003)(citing *Overton v. Bazzetta*, 539 U.S. 126, 132, 123 S.Ct. 2162, 2168, 156 L.Ed.2d 162 (2003)).

The Supreme Court has identified four factors for courts to consider when determining whether a regulation or practice is reasonably related to legitimate penological interests: (1) whether there is a "valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it"; (2) "whether there are alternative means of exercising the right that remain open to prison inmates"; (3) "the impact accommodation of the asserted constitutional right will have on guards and other inmates and on the allocation of prison resources generally"; and (4) the "absence of ready alternatives," or, in other words, whether the rule is an "exaggerated response to prison concerns." *Turner*, 482 U.S. at 89-90; 107 S.Ct. at 2261-62. The factors are considered to determine whether the state shows a "reasonable" relation between the policy and legitimate penological objectives, rather than simply a "logical" one. *Beard,* 548 U.S. at 533, 126 S.Ct. at 2580. Disputes about facts must be distinguished from disputes about matters of professional judgment. *Id.* at 530, 126 S.Ct. at 2578. Substantial deference must be given to prison administrators' professional judgment. *Id.*, 126 S.Ct. at 2578. Unless a prisoner can point to evidence showing the policy is not reasonably related to legitimate penological objectives, sufficient to allow him to prevail on the merits, he cannot prevail at the summary judgment stage. *Id.,* 126 S.Ct. at 2578.

Contant's First Amendment claim is that the defendants removed him from the religiously compliant for non-legitimate penological reasons. Strict adherence to the religious diet was required under both the old policy and the prison's new policy. The new

policy spelled out specific consequences for non-compliance.  Contant was denied the common fare diet only after it was learned he was consuming and purchasing food items that did not comply with Muslim religious restrictions.  Contant's own conduct demonstrated that he was not concerned with following the tenets of his religion as he was consuming regular food items.  As the defendants' temporary suspension of Contant's participation in the common fare diet was based on Contant's actions, the defendants had a legitimate penological interest in discontinuing his participation in the diet.  Warden Lowe affirms that requiring strict adherence to the religious modified or common fare diet "supports the valid penological interests of restricting the religiously compliant diet to those inmates who adhere to the dietary restrictions of the religion and in reducing the expense of preparing the special diet to those inmates who comply with it."  Doc. 56, Lowe Decl. at ¶ 4. Concerns of maintaining prison discipline in the facility and avoiding the reallocation of limited financial resources for an inmate who does not adhere to the tenets of his own religion is a legitimate penological interest.

We conduct the following *Turner* analysis.  In this instance, there is a valid, rational connection between the policy requiring a prisoner being granted a special religious diet to strictly adhere to the diet or suffer removal from the diet, and the legitimate governmental interest put forward to justify this policy.  The legitimate governmental interests are budgetary.  Also, the regulation is reasonable in its scope in that it does not permanently terminate the inmate's right to participate or obtain a religiously compliant diet. Rather, an inmate may request re-enrollment in the common fare diet once every ninety days.  Doc. 55-2 at p. 2.

As to the next *Turner* factor, we must consider whether Contant had alternative means of practicing his religion generally, "not whether he has alternative means of engaging in the particular practice in question." *DeHart*, 227 F.3d at 55. "If the policy does afford the inmate alternative means of expressing his religious beliefs, that fact tends to support the conclusion that the regulation at issue is reasonable." *Id.* at 57. Here, the only First Amendment claim asserted is that he was denied Halal meals. There is no indication that he was denied other means of practicing his religion such as daily prayer or religious services.

Under *Turner's* third factor, the court must examine the impact of an accommodation on the other inmates, prison staff, and the available resources within the prison. The compelling nature of the defendants' argument on this factor in light of current city, county, state and federal budget crises is hard to overcome. If all inmates who claimed to have religious dietary restrictions were accommodated, without any monitoring or scrutiny to ensure that they are truly following the same restraints they wish defendants to operate under when providing them meals, the overall impact on prison resources would be financially and logistically adverse. Warden Lowe affirms that requiring strict adherence to the religious modified or common fare diet "supports the valid penological interests of restricting the religiously compliant diet to those inmates who adhere to the dietary restrictions of the religion and in reducing the expense of preparing the special diet to those inmates who comply with it." Doc. 56, Lowe Decl. at ¶ 4.

The fourth *Turner* factor considers whether there is an "absence of ready alternatives" to the challenged policy. *Turner*, 482 U.S. at 90, 107 S.Ct. at 2262. "[I]f an

inmate claimant can point to an alternative that fully accommodates the prisoner's rights at *de minimis* cost to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard." *Id.* at 91, 107 S.Ct. at 2262.  Contant does not identify any alternative, and the Court is hard pressed to imagine a more practical or reasonable alternative to the policy of monitoring the voluntary food selections of inmates requesting a specialized religious diet for signs of compliance with the diet.  Based on the above, it is clear that the defendants' action of removing Contant from the religiously modified diet after learning he was consuming and purchasing non-universal food items did not amount to a violation of his First Amendment rights.

Contant also argues his due-process rights were violated when he was temporarily removed from the common fare diet without notice of the penalty provisions of the new June 2008 Modified Diet (common fare) plan versus the previous "Meal Procedures" policy, under which he was first granted a religiously compliant kosher diet. Contant claims he was not notified that the June 2008 Modified Diet policy threatened removal from the diet if he "fail[ed] to observe the modified dietary restrictions," doc. 56-2 at p. 1, as opposed to the previous policy which had no such sanction, but which nonetheless, required "strict[ ] adher[ence]" to the religious meals.  Doc. 62 at p. 6.

We reject this claim.  Plaintiff has no property or liberty interest in receiving Halal meals, *see Russell v. Wilkinson*, 79 F. App'x 175, 178 (6th Cir. 2003) (nonprecedential) (denial of kosher meals did not involve a property or liberty interest for the purpose of due process analysis and hence the plaintiff inmate had no claim that he was not notified of the sanction of removal from the diet); *Rogers v. United States*, 696 F.

Supp. 2d 472, 500-01 (W.D. Pa. 2010)(inmate has no due-process right to religiously approved food)(following *Russell*).

### B. Contant's Claim Under Religious Land Use and Institutionalized Persons Act

The RLUIPA, which expands First Amendment protections accorded prisoners with respect to their religious beliefs, specifically states:

> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . unless the government demonstrates that the imposition of the burden on that person —
>
> (1) is in the furtherance of a compelling governmental interest; and
>
> (2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc-1(a).[8] RLUIPA defines "religious exercise" to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. ¶ 2000cc-5(7)(A); *see also Cutter v. Wilkinson,* 544 U.S. 709, 715, 125 S.Ct. 2113, 2118, 161 L.Ed.2d 1020 (2005). Although RLUIPA does not permit a court to determine whether

---

[8] RLUIPA applies only if one of two these conditions is met:

(1) the substantial burden is imposed in a program or activity that receives Federal financial assistance; or

(2) the substantial burden affects, or removal of that substantial burden would affect, commerce with foreign nations, among several States, or with Indian tribes.

42 U.S.C. § 2000cc-1(a).

the belief or practice in question is compelled by, or central to, a system of religious belief, RLUIPA does permit inquiry into the sincerity of the prisoner's religious beliefs. *Washington v. Klem*, 497 F.3d 272, 277 (3d Cir. 2007).

Under RLUIPA, Plaintiff must show a substantial burden on religious practices. *See* 42 U.S.C. § 2000cc-2(b); *Washington,* 497 F.3d at 277-78. The Third Circuit has found that for the purposes of RLUIPA, "a substantial burden exists where: 1) a follower is forced to choose between following the precepts of his religion and forfeiting benefits otherwise generally available to other inmates, versus abandoning one of the precepts of his religion in order to receive a benefit; OR 2) the government puts substantial pressure on an adherent to substantially modify his behavior and to violate his beliefs." *Id.* at 280 (footnote omitted). Once a substantial burden is established, the burden shifts to the government to show that the regulation "is in furtherance of a compelling governmental interest and is the least restrictive means of furthering this interest." *Id.* at 283; *see also* 42 U.S.C. § 2000cc-1(a)(1).

Although Congress intended that RLUIPA be construed "in favor of broad protection of religious exercise," *see* 42 U.S.C. § 2000cc-3(g), Congress also "anticipated that courts would apply the Act's standard with 'due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources.'" *Cutter*, 544 U.S. at 723, 125 S.Ct. at 2123. Congress indicated that in the event an inmate's request for religious accommodation would "become excessive, impose unjustified burdens on other institutionalized persons, or jeopardize the

effective functioning of an institution, the facility would be free to resist the imposition." *Id.* at 726, 125 S.Ct. at 2125.

Without any citation to supporting case law, the defendants argue that "RLUIPA is inapplicable" because Contant has not proven that the prison "receives any Federal financial assistance."[9]  Doc. 53, Defs.' Br. in Supp. Mot. for Summ. J. at p. 9.  We are not persuaded by the defendants' argument as RLUIPA allows a person to bring a claim "and obtain relief against a government."  42 U.S.C. § 2000cc-2(a).  "Government" is defined in RLUIPA as "(I) a State, *county*, municipality, or other governmental entity created under the authority of a State; (ii) any branch, department, agency, instrumentality, or official of an entity listed in clause (I); and (iii) and other person acting under color of State law."  42 U.S.C. § 2000cc-5(4)(a)(iii)(emphasis added).  Nonetheless, the record before the Court allows for the resolution of Contant's RLUIPA claim.

Here, Plaintiff has not demonstrated that the prison has substantially burdened the free exercise of his religion, under either prong of the *Washington* test.  To the contrary, the prison's policy honors his religious dietary requirements, and only comes into play when an inmate fails to adhere to those requirements.  The prison's temporary removal of Contant from the special religious diet for a period of time until he elected to stop purchasing and consuming regular commissary items was not violative of RLUIPA.

---

[9] Contant counters with the fact that the prison "receives Federal financial assistance from the U.S. Department of Homeland Security and/or [the] U.S. Immigrations and Customs Enforcement (ICE) to house immigration detainees," like himself.  Doc. 62, Contant Aff. at p. 2.

C.  *Contant's Claim Under the Pennsylvania Religious Freedom Protection Act*

Contant argues the prison's policy allowing for his temporarily removal from participation in the modified religious diet program is invalid pursuant to Pennsylvania's Religious Freedom Protection Act (RFPA), 71 Pa. Stat. Ann. §§ 2401-2407 (West Supp. 2010).

The defendants argue that this statute does not apply to "inmates," citing 71 Pa. Stat. Ann. § 2405(g).  We need not deal with this argument as Plaintiff has no claim under the RFPA anyway.  The remedies under the act are limited to injunctive and declaratory relief.  Monetary damages are forbidden.  71 Pa. Stat. Ann. § 2405(f).  Hence Plaintiff has no claim because he cannot recover the damages he seeks and he is not entitled to the injunctive relief he seeks as that claim is moot.  Plaintiff was reinstated to the prison's religious diet program and in any event is now confined in the Perry County Prison.

D.  *Claims against Non-Management Corrections Officers (Wincovich, Derrick, Kumures, Lambigne, Frawley and DeLaplace) are Dismissed for Failure to State A Claim.*

Contant alleges Warden Lowe and Assistant Warden McLaughlin deprived him of a religiously compliant diet from June 10, 2008, through October 8, 2008.  Doc. 59 at ¶ 6. Contant believes Warden Lowe has the ultimate authority to grant or deny a request for accommodation.  *Id.* at ¶ 7.  Defendants Wincovich, Derrick, Kumures, Lambigne, Frawley and DeLaplace played no role in formulating the Dietary Policy or suspending Plaintiff from the diet.  DSF at ¶ 9.  To the extent DeLaplace authored an incident report stating he witnessed Contant eating soup while on the common fare diet (doc. 58 at p. 9),

this report was forwarded to the shift commander and as Contant states, he has not received a disciplinary report for any dietary issues.  It was this report in conjunction with the examination of his commissary purchases that led to his removal from the specialized diet.  Contant has not provided any evidence to controvert defendants' statement, or the policy's statement, that the power to grant or deny religious diet accommodations rests with Warden Lowe and Deputy Warden McLaughlin.  Doc. 55 at p. 3 and Doc. 56 at p. 2.  Plaintiff has not demonstrated that any of the non-administrative defendants, i.e. those other than the Warden and Deputy Warden, had the authority to remove or enroll him in the prison's religiously modified diet plan.  Thus, their mere act of serving him his meals, or denying his requests for them to go outside the requirements and procedures of the Modified Diets policy, did not violate his First Amendment or RLUIPA rights or suggest their involvement in any violation of his constitutional rights.

        An appropriate order will issue.

        /s/William W. Caldwell
        William W. Caldwell
        United States District Judge

Date: March 30, 2011

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ISAN CONTANT, | : |
| Plaintiff | : |
| vs. | : CIVIL NO. 1:CV-08-1403 |
| CRAIG LOWE, *et al.*, | : (Judge Caldwell) |
| Defendants | : |

## *O R D E R*

AND NOW, this 30th day of March, 2011, for the reasons set forth in the accompanying memorandum, it is ordered that:

    1. Defendants' Motion for Summary Judgment (doc. 52) is granted.

    2. Plaintiff's Motion for Summary Judgment (doc. 57) is denied.

    3. The Clerk of Court is directed to enter judgment in favor of defendants Warden Lowe, Sgt. Wincovich, Sgt. Derrick, Deputy Warden McLaughlin, Lt. Kumbures, Lt. Lambigne, Sgt. Frawley, Officer DeLaplace and against Plaintiff.

    4. The Clerk of Court shall close this file.

                                           /s/William W. Caldwell
                                            William W. Caldwell
                                            United States District Judge